## BARNEY v. KEOKUK.

1. In order that the passage-ways of commerce and navigation might be subject to public authority and control, the title to the land under water and to the shore below ordinary high-water mark, in navigable rivers and arms of the sea, was, by the common law, vested in the sovereign for the public use and benefit.
2. In England, tide-waters only were regarded as navigable. Hence the rule as to property was often expressed as applicable to them only, although the reason of it would make it apply to all navigable waters.
3. The form, instead of the substance, of the rule has been adopted in many of the States of this country; and in them the public title to the beds and shores of navigable streams is confined to tide-water.
4. From the same cause, the admiralty jurisdiction of the United States was for a long period restricted to tide-water.
5. Since the decision of this court in *The Genesee Chief*, in 1851 (12 How. 443), declaring all the great lakes and rivers of the country navigable that are really such, there is no longer any reason for thus restricting the title of the State, except as a change in that respect might interfere with vested rights and established rules of property.
6. In Iowa, the true rule has been adopted; and it is held that the bed of the Mississippi River and its banks to high-water mark belong to the State, and that the title of the riparian proprietor extends only to that line.
7. This rule applies as well where the land was granted to bound upon the river generally (as in the case of the Half-breed Sac and Fox reservation), as where it was granted according to surveys run along the bank by a meandering line. Hence it applies in the city of Keokuk, which is on that reservation.
8. The public authorities, therefore, have the right, in Iowa, to build wharves and levees on the bank of the Mississippi below high water, and make other improvements thereon, necessary to navigation, or public passage by railways or otherwise, without the consent of the adjacent proprietor, and without making him compensation.
9. Although no permanent obstruction, like a depot building, can be erected on the streets of a town, it is held in Iowa that they may, by public authority,

be occupied by railway tracks without the consent of the adjacent propri-
etor, and without compensation, whether the fee of the streets be in him (as
in the city of Keokuk) or in a third person.

10. There is no substantial difference between streets in which the legal title is
in private individuals and those in which it is in the public, as to the rights
of the public therein

ERROR to the Circuit Court of the United States for the District of Iowa.

This was an action of ejectment brought by the plaintiff against the city of Keokuk and several railroad companies and a steam-packet company, to recover the possession of certain premises occupied by them with railroad tracks, buildings, and sheds on the bank of the Mississippi River, in the city afore-said. The plaintiff, in his petition, described the premises as follows : " All the land lying and being in front of lots 5 and 6, in block 3, in the city of Keokuk, Lee County, Iowa, and ex-tending from the front line of said lots to the Mississippi River the full width of said lots." The petitioner states that he is the owner in fee-simple of the premises, subject only to the right of the public to use that part of them embraced within the limits of Water Street as a public highway, and is entitled to possession as against the defendants, that the city of Keo-kuk claims to be the proprietor, and the other defendants occupy as its tenants.

The city, by its answer, admitting that the plaintiff is owner of lots 5 and 6, in block 3, states, in substance, that all the land in front of them down to the Mississippi River was in 1840 dedicated to public use as a street and levee, and, as such, has been used and improved ever since under the possession and control of the city, by virtue of its charter, and has, at its expense, been extended out about two hundred and fifty feet by depositing earth and stone in the river, in order to make the wharf and levee more convenient, safe, and useful. Other defences were interposed, which it is not necessary to specify.

The other defendants claim under authority of the city.

The cause was tried by the court, and a special finding of the facts and the law was made.

From these findings, it appears that the city of Keokuk is situated upon a tract of land lying between the Mississippi and

the Des Moines Rivers, in Lee County, Iowa, known as the "Half-breed Sac and Fox reservation," which, by treaty with the Sac and Fox tribes of Aug. 4, 1824, 7 Stat. 229, was granted to the half-breeds of those tribes, to be by them held in the same manner as other Indian titles are held. The fee, with power of alienation, was subsequently vested in them. Numerous parties became interested in the tract by purchase, and a town was laid out and lots sold as early as 1837; but no regular town plat, having the requisites of the town-plat law of 1839, seems to have been filed or recorded in the recorder's office of the county. One Galland, who seems to have been a part owner, made out such a plat, and filed it; but there is no proof that he had authority for his acts from the other proprietors. In 1840, suit for a partition of the tract was commenced, and regular proceedings were had, resulting, in October, 1841, in a final decree of partition, made according to the report of commissioners, and embodying a plat or map of the town of Keokuk. Said lots 5 and 6, in block 3, are exhibited on this map, and were drawn by the parties under whom the plaintiff claims title. In its findings of fact, the court sets forth portions of the decree, and, amongst other things, the following: —

"In describing each of said shares, the commissioners appointed by the court say, among other things: 'The lots upon Water Street include all the land in front of them to the Mississippi River.'

"And, after describing all the shares, they say: —

"'In describing the boundary of the town-lots situated on Water Street in the towns of Keokuk and Nashville, we have made them to include all the land in front of them to the Mississippi River, by which we mean in front of them, facing the river, parallel with the streets running from Fourteenth Street to Water Street.'

"And in describing the plat of Keokuk, the commissioners' report, among other things, says: —

"'Plat of Keokuk, in the county of Lee, Territory of Iowa, upon the half-breed tract, the outlines of which were designated and marked by Jenefer T. Spring in his survey as town reservation, . . . Water Street is of unequal and irregular width at the points where the dotted lines pass across the same.

"'The street is of the width in feet as is represented by the figures set on said lines.' 'Water Street extends the whole front on river side of the town, or from the intersection of Orleans Street with the

Mississippi River, down the right bank of the river, with the meanders thereof, to the intersection of Cedar Street with the Mississippi River.'"

The Galland map was produced on the trial, also a fragment of another map, which bears date August, 1840, found in the recorder's office. By these, as well as the map embodied in the decree, the space between the front of the lots and the river is designated as Water Street, and appears to have been, at that time, about one hundred feet wide.

As to the occupation of Water Street in front of the plaintiff's lots, and its extension on the river side, the court found: —

"The city of Keokuk has, since the year 1865, caused the space originally covered by water on the river side of Water Street, in front of said lots, to be filled in with earth and stone for a space of over two hundred feet beyond the original water-line to ordinary high-water mark, and about three hundred and fifty-two feet to low water mark, said filling having been done by said city. That part of the space between the front of said lots and the river at ordinary high-water mark is occupied as follows: —

"1. By the freight-house or depot of the defendant, the Keokuk and Des Moines Railway Company, . . . a permanent and substantial frame building. It has been standing a good many years, . . . is used for storing freight by said railroad company, is two hundred and three feet long and twenty feet wide, and one story high, and covers the whole of the front of said lots-5 and 6, block 3.

"2. By the railroad tracks used by the defendants, the Keokuk and Des Moines Railway Company, the Mississippi Valley and Western Railway Company (now St. Louis, Keokuk, and North-western Railway Company), the Toledo, Peoria, & Warsaw Railway Company, and the Toledo, Wabash, and Western Railway Company. Altogether there are ten railroad tracks between the front of said lots and high-water mark.

"3. By the building known as the Keokuk Northern Line Packet depot, . . . a permanent and substantial building, one hundred feet long and fifty feet wide, formed of substantial timbers, and about fourteen or fifteen feet high. It was built by said packet company for its own use in carrying on its business as a common carrier by steamboats on the Mississippi River, and is used by it in connection with its transportation business for the temporary storage of freight

carried or to be carried by said company, and also for the business offices of said company at Keokuk. Said building has five large doors through which teams are driven in delivering or receiving freight, and which doors are closed at night. The building is one and a half stories high, with office rooms on second floor, and the ground-floor is of heavy two-inch lumber laid on sills about two feet apart."

The map shows that this building stands on the newly made ground below original high water.

The court further found : —

" That none of the defendants so occupying said ground, nor the city, has caused any condemnation, nor asked or obtained the permission of plaintiff, nor paid him any damages in compensation for the use of said ground. But they all and severally hold the same under the license or permission of the city of Keokuk only."

As conclusions of law under the foregoing facts, the court found : —

" 1. There was no completed statutory dedication of Water Street under the town-plat act of 1839 prior to the decree of partition, for the reason, among others, that all of the proprietors, *i.e.*, the half-breed owners and their grantees, did not join in making a plat, or in selling lots according to the Galland or other plat. What was done prior to the decree was at most a common-law dedication by those who platted or recognized the plat, and it was therefore competent for the decree of partition to provide, as it did, ' that the lots on Water Street should include all the land in front of the lots to the Mississippi River.' "

This leaves the fee of the land constituting Water Street in the plaintiff, subject to the rights of the public.

" 2. The additional ground made by filling in Water Street outside of the original water-line partakes of the same character as the original street. The fee of the newly made ground in front of the plaintiff's lots is in the plaintiff, but it is subject to the same public uses as the original street.

" 3. Under the law of Iowa, as construed by the Supreme Court of the State, railroad companies, certainly, with the assent of the municipal authorities, have the right to lay down their tracks in the streets of a city, whether they were dedicated under the statute or as at common law ; that is, whether the fee is in the city or in the adjoining proprietor.

" 4. This, however, does not give the railway company, even with the assent of the municipality, the right to erect a permanent and substantial depot-building in the street.

" 5. In view of the location and situation of Water Street and the presumed intention of the dedication thereof to the public, and guided by the view of the Supreme Court of the State in this regard in *Haight* v. *The City of Keokuk*, and the power of the city as to wharves, and the use of Water Street for that purpose, given to the city of Keokuk by the act of the legislature of 1853, Water Street may be used for levee and wharf purposes under municipal management and control.

· " The building erected by the packet company under the contract with the city, of March 28, 1870, for the purposes therein mentioned, for the receipt and temporary shelter and storage of goods, &c., subject to municipal control, is a reasonable use of Water Street as a wharf or levee as incidental to the requirements of navigation and shipping, and does not infringe the plaintiff's rights."

The provisions of the charter of the city of Keokuk, which bear upon the case, are set out in the opinion of the court.

There was a judgment for the defendants, and the plaintiff sued out this writ of error. ·

*Mr. George W. McCrary* for the plaintiff in error.

The plaintiff is, by the decision of the court below, the owner in fee of Water Street and the ground in front of it, and they could not, without his consent and without compensation, be taken and devoted by the city to the use of railroad companies, to be covered with tracks for the passage of engines and cars. *Railroad Company* v. *Schurmeir*, 7 Wall. 272.

Even if the fee was vested in the city, the latter could not appropriate it to any use or purpose which would depreciate the value of the premises of an adjoining owner. *Railroad Company* v. *Schurmeir, supra ;* 1 Redfield on Railways, sect. 8, p. 312; Dillon on Mun. Corp., sects. 558, 576.

The legislature cannot authorize the appropriation of a street for railroad purposes, without compensation to the owner of the fee. *Wagner* v. *Troy Union Railroad Co.*, 25 N. Y. 526; 16 id. 97 ; 24 id. 655, 658 ; *Bolling* v. *City of Petersburg*, 3 Rand. (Va.) 563; 13 Conn. 309; 3 id. 90; 5 id. 305; *Imlay* v. *Union Branch Railroad Co.*, 26 Conn. 255; *Ford* v. *Chicago & N. W. Railroad Co.*, 14 Wis. 616; *Pomeroy* v. *C. & M. Rail-*

*road Co.*, 16 id. 640 ; *Perley* v. *Chandler*, 6 Mass. 453 ; 21 Wis. 602 ; 14 id. 609 ; Cooley on Const. Lim., pp. 546 *et seq.*, 548 and note 2 ; Dillon on Mun. Corp., sects. 558 and note, 573 and note, 575–577 ; Redfield on Railways, pp. 299 and note, 309, 311 ; 14 Ohio St. 548 ; 7 id. 459 ; 7 Ind. 479 ; *Haynes* v. *Thomas*, 3 Hill, 567 ; *Mahin* v. *Railroad Company*, 24 N. Y. 658 ; *Bissel* v. *Railroad Company*, 23 id. 61 ; *Clark* v. *Blackmas*, 47 id. 150 ; s. p. *Railroad Company* v. *Reed*, 41 Cal. 256 ; *Harrington* v. *Railroad Company*, 17 Minn. 215–224 ; *Gray* v. *Railroad Company*, 13 id. 315 ; *Williams* v. *Plank-road Company*, 21 Mo. 580 ; *Fletcher* v. *Railroad Company*, 25 Wend. (N. Y.) 462.

In this case there is no pretence of express legislative authority, and the only question is, whether, under a power to regulate streets, the city may, against the objection of the owner of the fee, authorize their use for this purpose. The following authorities hold that the city has no such power : *Wagner* v. *Troy Union Railroad Co.*, 25 N. Y. 526 ; *Williams* v. *N. Y. Central Railroad*, 16 id. 97 ; *Presbyterian Society of Waterloo* v. *Auburn Railroad Co.*, 3 Hill (N. Y.), 567 ; *Lade* v. *Sheppard*, 2 Str. 1004 ; *Inhabitants of Springfield* v. *Conn. River Railroad Co.*, 4 Cush. (Mass.) 63 ; *Ford* v. *Chicago & N. W. Railroad Co.*, 14 Wis. 663 ; *Weisbold* v. *Chicago & N. W. Railroad Co.*, 21 id. 602 ; *Lackland* v. *North No. Railroad Co.*, 31 Mo. 180 ; *Craig* v. *Rochester City & Br. Railway*, 39 Barb. (N. Y.) 494 ; *Warren* v. *State*, 5 Dutch. (N. J.) 393 ; *Veazie* v. *Penobscot Railroad Co.*, 49 Me. 119 ; *Brown* v. *Duplessis*, 14 La. Ann. 842 ; *Pomeroy* v. *Mills*, 3 Vt. 279 ; Dillon on Mun. Corp., sects. 521, 558 ; *Flemingsburg* v. *Wilson*, 1 Bush (Ky.), 203 ; *State* v. *Railroad Company*, 3 Zabr. (N. J.) 360.

It has never been held by the Supreme Court of Iowa that any statute of that State authorizes a municipal corporation to devote one of its streets to the use of a railroad company for laying its tracks and operating its road thereon, without the consent of the owner of the fee, and without compensation where that owner is a private person. The cases of *Milburn* v. *Cedar Rapids*, 12 Iowa, 246 ; *Clinton* v. *Cedar Rapids & Mo. Railroad Co.*, 24 id. 455 ; *Slatten* v. *Railroad Co.*, 29 id. 148 ; *Cook* v. *City of Burlington*, 30 id. 94 ; *City of Davenport* v. *Stevenson*,

34 id. 225; *Ingraham* v. *Railroad Company*, id. 249; *Cook* v. *City of Burlington*, 36 id. 357; *Chicago, &c. Railroad Co.* v. *Mayor of Newton*, id. 299, relied upon by the court below in support of its decision, do not sustain the converse of this proposition.

The decree in the partition suit passed in 1841 vested the fee of the ground between the lots on Water Street and the Mississippi River in the owners of said lots. *Haight* v. *The City of Keokuk*, 4 Iowa, 199; *Milburn* v. *Cedar Rapids, supra.*

The ground in front of plaintiff's lots, in so far as it was ever dedicated to any public use, was dedicated as " Water Street," and this would not authorize its use for levee and wharf purposes. *Pearsoll* v. *Post*, 20 Wend. (N. Y.) 131; *Same* v. *Same*, 22 id. 425; *Prosser* v. *Wapello County*, 18 Iowa, 338; *Prosser* v. *Davis*, id. 367; *Railroad Company* v. *Shurmeir*, 7 Wall. 289; *Pipkin* v. *Wynus*, 2 Dev. (N. C.) L. 402, 404; *State* v. *Wilson*, 42 Me. 27; *Chicago* v. *Lafflin*, 49 Ill. 172; *Eisminger* v. *The People*, 47 id. 384; *Wetmore* v. *Gas-Light Co.*, 42 N. Y. 384; *Denton* v. *Polk County*, 9 Iowa, 596; *Trustees* v. *Railroad Company*, 3 Hill (N. Y.), 569; *Cartelyou* v. *Van Brundt*, 2 Johns. (N. Y.) 356.

The decision of the court below, so far as it is adverse to the plaintiff, ignores, and in effect destroys, his rights and property as a riparian proprietor. *Dutton* v. *Strong*, 1 Black, 1; *Yates* v. *Milwaukee*, 10 Wall. 497; Angell on Tide-Waters, p. 171; *Kraut* v. *Crawford*, 18 Iowa, 553.

The authorities cited by the defendants' counsel to show that the title to the bed of the Mississippi is in the State do not sustain his proposition, that where the bank is extended by either natural or artificial means, so as to raise the bed of the river and make it dry land, it still remains the property of the State. He does not attempt to maintain by any authority that such made land may, by the State or city, be conveyed to private persons for their exclusive use, thus destroying the riparian rights of individuals. When the original bank of the river is filled in, the made ground partakes, not of the nature of the bed of the stream, but of the shore to which it is added. The moment the land was filled in, by whomsoever done, it became the plaintiff's. *Nichols* v. *Lewis*, 15 Conn. 137; *New Orleans* v.

*United States*, 10 Pet. 622; 12 Curtis, 299. *Atlee* v. *Packet Company*, 21 Wall. 389, is in perfect harmony with this doctrine. The question there was not whether Atlee could be cut off from the navigable channel and his river-front by filling in, as in the case at bar, but whether, without license or authority, except such as arose from his ownership of the adjacent shore, he could lawfully build a pier in that channel.

Much of the argument on the other side may be answered by the simple suggestion that the plaintiff is not suing for the bed of the river, but for high and dry land, occupied by railroad tracks and buildings. Counsel seems to realize this, for in his brief there is no attempt to answer the conclusive suggestion of the court below, that "the additional ground made by filling in Water Street, outside of the original water-line, partakes of the same character as the original street."

Counsel insists upon the power given to the city of Keokuk by its charter to construct a wharf, and to use Water Street for that purpose, but omits to state the important fact that this authority was coupled with an explicit provision that just compensation should be made for private property taken for this purpose. As the charter makes this requirement, there is no foundation for the claim that it authorized the city to take the plaintiff's property without compensation.

*Mr. Robert G. Ingersoll* for the defendants in error.

By the dedication of Water Street, the legal title to the demanded premises was vested in the city, and not in the adjacent lot-owners. *Hall* v. *The City of Des Moines, supra; Milburn* v. *Cedar Rapids*, 12 Iowa, 249; *Fulton* v. *City of Davenport*, 17 id. 408; *Yast* v. *Leonard*, 34 id. 15; *Jackson* v. *Hathaway*, 15 Johns. (N. Y.) 448; *Tyler* v. *Hammon*, 11 Pick. (Mass.) 193; *O'Lindar* v. *Lathrop*, 21 id. 292; *Gebhardt* v. *Reeves*, 75 Ill. 304. The plaintiff, as the pretended owner of the street, has, therefore, no right to the possession, or to damages. But, if he were the owner, the use of the street for a purpose not intended by the original dedication would not entitle him to recover. *Warren* v. *The Mayor of Lyons City*, 22 Iowa, 351; *Cook et al.* v. *The City of Burlington*, 30 id. 94; *Pettingill* v. *Devin*, 35 id. 355; *Carpenter* v. *Mooers*, 26 Ill. 162 *Alvis et al.* v. *Morrison et al.*, 63 id. 182.

Plaintiff claims the fee of the made land, on the ground of alleged riparian proprietorship. The Mississippi was, by law, a public highway. The treaty of 1824 with the Sacs and Foxes, reserved the tract whereon Keokuk is situate for the use of the half-breeds, to be held as other Indian titles. In 1832, the Indian right was extinguished. In 1834, the United States vested the fee of the tract in the half-breeds; but no title to the land below high-water mark was conveyed to them. The United States did not own the bed of the river, but, claiming and possessing jurisdiction and sovereignty over that region of country, established, by an act of March 3, 1839, the eastern boundary of the Territory of Iowa as " the middle of the channel of the Mississippi River." When the State was admitted, the same boundary was recognized. It follows that her right to all the land beneath high-water mark was not affected by the grant to the half-breeds, and is as full and complete in front of the site of the city of Keokuk as at any other point on the eastern boundary of the State.

By the American Revolution, the people of each State, in their sovereign character, acquired the absolute right to all their navigable waters and the soil under them. That right was not granted by the Constitution to the United States, but was reserved to the States respectively. And new States have the same right of sovereignty and jurisdiction over the navigable waters within their limits as the original ones. *Martin* v. *Waddle*, 16 Pet. 367 ; *Goodtitle* v. *Kibbe*, 9 How. 471 ; *Pollard's Lessee* v. *Hogan et al.*, 3 id. 212 ; *Pollard* v. *Kibbe*, 14 Pet. 353 ; *Withers* v. *Buckley*, 20 How. 84 ; *County of St. Clair* v. *Lovingston*, 23 Wall. 46 ; *Attorney-General* v. *City of Eau Claire et al.*, 37 Wis. 447.

The State, having the complete and absolute right of property from high-water mark to the middle of the channel of the river, holds it for public uses, subject only to the power of Congress to regulate commerce among the several States and with foreign nations. *McManus* v. *Carmichael*, 3 Iowa, 57, and cases there cited; *Haight* v. *The City of Keokuk*, 4 id. 213 ; *Prosser* v. *Davis*, 18 id. 371.

The city, when it was organized, had its eastern boundary at low-water mark, and became the riparian proprietor of the

soil in front of Water Street.  The State conferred upon it the
right to control the wharf privileges and the landing of boats
there, but retained, and still retains, in trust for the public at
large, the title to the land underneath the channel of the river.

As the Mississippi is navigable, it follows that the rule in
regard to the ownership of the bed of navigable waters governs
this case.  *La Plaisance Bay Harbor Co.* v. *City of Monroe*,
Walk. Ch. 168; *Carson* v. *Blazer*, 2 Binn. (Pa.) 475; *Rundle* v.
*Del. & Raritan Canal Co.*, 14 How. 80; *Commonwealth* v. *Alger*,
7 Cush. (Mass.) 94.

The plaintiff, having no grant from the State, acquired in the
soil of the river and its banks no *jus privatum*, and none of the
riparian rights arising therefrom.  *Atlee* v. *Packet Company*,
21 Wall. 389, recognizes the distinction between *jus publicum*
and *jus privatum.*  While affirming the right of cities and
towns to build wharves and project piers into navigable riv-
ers, it declares that a riparian proprietor can exercise such a
right only when it has been conferred upon him by express leg-
islative authority.  This doctrine is based on the familiar prin-
ciple that the State, as the absolute owner of the navigable
waters within its borders, can dispose of them to the exclusion
of riparian owners.  *People* v. *Tibbetts*, 19 N. Y. 523; *People*
v. *Canal Appraisers*, 33 id. 487; *Mumford* v. *Wardwell*, 6 Wall.
436; Angell on Tide-Waters, 199.; *Hudson River Railroad Co.*
v. *Loeb*, 7 Robt. (N. Y.) 418.

As the grantors of the plaintiff were never proprietors of the
land to the margin of the river, no question of accretions by
either alluvion or artificial means can arise.  *Bates* v. *Illinois
Central Railroad Co.*, 1 Black, 204; *Johnston* v. *Jones et al.*,
id. 209; *In re Hull & Selby Railway Co.*, 5 M. & W. 327;
*Kraut* v. *Crawford*, 18 Iowa, 551; *Cook* v. *The City of Bur-
lington*, 30 id. 97.

The right of the State, or the city as its authorized agent, to
appropriate the lands between high and low water mark for
railway tracks, without compensation to the plaintiff, can hardly
be considered an open question.  *Gould* v. *Hudson River Rail-
road Co.*, 12 Barb. 628; *Getty* v. *Same*, 21 id. 628; *Gould* v.
*Same*, 6 N. Y. 543; *Illinois, &c. Canal Co.* v. *St. Louis*, 2 Dill.
78; *Railroad Company* v. *Stevens*, 10 Am. Law Reg. 168;

*Pennsylvania Railroad Co.* v. *New York & Long Branch Railroad Co.*, 23 N. J. Eq. 159.

The plaintiff assuming that the track of a railroad is an additional burden, not contemplated in the original dedication, insists that the railroad companies have no right to lay their tracks upon Water Street, without compensation to the adjoining lot-owners. This is not true, whether the fee of the street is in the corporation, or in him. The use of streets is in the public, no matter who holds the fee, and a railroad, being an improved highway, is within the scope of the public purposes for which they were laid out. In Iowa, the lot-owner has no exclusive right to use them. The city is responsible for the condition of the sidewalks, because they are under its control as part of the streets. It can use the entire surface of the street, pave, curb, gutter, build sewers, lay water and gas pipes, permit the erection of telegraph poles and the construction of horse railways. The running of a railway car, whether propelled by horse or steam power, is not a permanent obstruction of the street. The track itself, when laid down by the railroad companies, under the direction of the proper authorities, and properly planked or paved, so as not to obstruct materially the passage of persons and vehicles over it, is not a burden for which compensation should be claimed. If it was so considered, a city having the fee of streets would be entitled to compensation for laying such tracks without its consent. But in Iowa, where it holds the naked title for public use, no such right accrues. So with the abutting lot-owner, in case of a common-law dedication. The use of a street for railway tracks makes no change in the title. Only a license or an easement is secured, which is no more a nuisance or a purpresture to him, than the laying of gas-pipes or the building of sewers.

The State has, by statute, given to railway companies the right to run upon highways and across streams, and subjected lands used for public purposes to the easement of railway tracks. In such cases the fee abides in the owner, whereas, in condemnation, he is divested of his title, and the public or the State takes his entire interest. We insist, therefore, that an individual has no right to compensation for such use of the street as in this instance the municipality has authorized.

If he has sustained some special damage, he can recover for it, but for none other. *Ingram et al.* v. *C. D. & M. Railroad Co.*, 38 Iowa, 675; *Gear* v. *The C. C. & D. M. Railroad Co.*, 39 id. 25; *Casby* v. *Owensboro' & Russellville Railroad Co.*, 10 Bush (Ky.), 291; *Tompkins* v. *Hodgson et al.*, 2 Hun (N. Y.), 148; *Warren* v. *Grand Haven*, 30 Mich. 28; *Chicago, Rock Island, & Pacific Railroad Co.* v. *City of Joliet*, 2 West. Jurist, 667.

MR. JUSTICE BRADLEY, after stating the case, delivered the opinion of the court.

We agree with the court below that the dedication of the streets of Keokuk was a dedication at common law, and not under the statute; and that, in making this dedication, the original proprietors of the tract reserved the title to the soil in the street, particularly in Water Street; and that this title went with the several lots fronting on the street, and extended to the Mississippi River. Whether, under the laws of Iowa, it also attached to the new ground formed by filling in upon the bed of the river is not so clear. It appears to be the settled law of that State that the title of the riparian proprietors on the banks of the Mississippi extends only to ordinary high-water mark, and that the shore between high and low-water mark, as well as the bed of the river, belongs to the State. This is also the common law with regard to navigable waters; although, in England, no waters are deemed navigable except those in which the tide ebbs and flows. In this country, as a general thing, all waters are deemed navigable which are really so; and especially it is true with regard to the Mississippi and its principal branches. The question as to the extent of the riparian title was elaborately discussed in the case of *McManus* v. *Carmichael*, 3 Iowa, 1. The above conclusion was reached, and has always been adhered to in that State. *Haight* v. *The City of Keokuk*, 4 Iowa, 199; *Tomlin* v. *Dubuque, &c. Railroad Co.*, 32 id. 106.

The peculiar origin of the title to the "Half-breed Sac and Fox reservation," in the peninsula lying between the rivers Mississippi and Des Moines, did not take it out of the general rule. This was so held in *Haight* v. *The City of Keokuk, supra.*

That case was nearly identical with the present as respects the claim of the adjoining proprietor to the title of the land in Water Street and on the river bank. Haight contested the right of the city to control the wharf along said street, claiming, by virtue of his fee-simple title, the right to erect a private wharf and to receive the emoluments thereof. His claim was overruled, and on the question of title the court said:—

"According to the case of *McManus* v. *Carmichael*, then, Haight owns the soil to high water only. But here is interposed the argument, that this land is not held under the United States by the usual manner of grants, that is, by patent, after a survey, and described by section, town, and range. This is true; but yet it will not affect the extent of the complainant's right. The grant to the half-breeds was to them as persons and not as a political body. The political jurisdiction remained in the United States. Had the grant been to them as a political society, it would have been a question of boundary between nations or States, and then the line would have been the *medium filum aquæ*, as it is now between Iowa and Illinois. . . . The grant was to them as individuals, — as tenants in common, — and is to be construed as any other grant or sale to individuals."

The court then goes on to refer to various cases to show that the government cannot convey the land between high and low water on the public or navigable rivers, but that this space belongs to the State; citing *Mayor of Mobile* v. *Eslava*, 9 Port. 578; 16 Pet. 234; *Pollard's Lessee* v. *Hagan*, 3 How. 212.

It is generally conceded that the riparian title attaches to subsequent accretions to the land effected by the gradual and imperceptible operation of natural causes. But whether it attaches to land reclaimed by artificial means from the bed of the river, or to sudden accretions produced by unusual floods, is a question which each State decides for itself. By the common law, as before remarked, such additions to the land on navigable waters belong to the crown; but as the only waters recognized in England as navigable were tide-waters, the rule was often expressed as applicable to tide-waters only, although the reason of the rule would equally apply to navigable waters

above the flow of the tide; that reason being, that the public authorities ought to have entire control of the great passageways of commerce and navigation, to be exercised for the public advantage and convenience. The confusion of navigable with tide water, found in the monuments of the common law, long prevailed in this country, notwithstanding the broad differences existing between the extent and topography of the British island and that of the American continent. It had the influence for two generations of excluding the admiralty jurisdiction from our great rivers and inland seas; and under the like influence it laid the foundation in many States of doctrines with regard to the ownership of the soil in navigable waters above tide-water at variance with sound principles of public policy. Whether, as rules of property, it would now be safe to change these doctrines where they have been applied, as before remarked, is for the several States themselves to determine. If they choose to resign to the riparian proprietor rights which properly belong to them in their sovereign capacity, it is not for others to raise objections. In our view of the subject the correct principles were laid down in *Martin* v. *Waddell,* 16 Pet. 367, *Pollard's Lessee* v. *Hagan,* 3 How. 212, and *Goodtitle* v. *Kibbe,* 9 id. 471. These cases related to tide-water, it is true; but they enunciate principles which are equally applicable to all navigable waters. And since this court, in the case of *The Genesee Chief,* 12 id. 443, has declared that the Great Lakes and other navigable waters of the country, above as well as below the flow of the tide, are, in the strictest sense, entitled to the denomination of navigable waters, and amenable to the admiralty jurisdiction, there seems to be no sound reason for adhering to the old rule as to the proprietorship of the beds and shores of such waters. It properly belongs to the States by their inherent sovereignty, and the United States has wisely abstained from extending (if it could extend) its survey and grants beyond the limits of high water. The cases in which this court has seemed to hold a contrary view depended, as most cases must depend, on the local laws of the States in which the lands were situated. In Iowa, as before stated, the more correct rule seems to have been adopted after a most elaborate investigation of the subject.

The exhaustive examination of this question by the Supreme Court of Iowa in 1856, in the case of *McManus* v. *Carmichael,* 3 Iowa, 1, really leaves nothing to be said. The precise point was directly before the court, — namely, whether the title of the riparian proprietor extends below high water, in the Mississippi River; and it was decided that it does not. This decision has been followed by subsequent cases, especially the cases of *Haight* v. *The City of Keokuk*, 4 id. 199; and *Tomlin* v. *Dubuque Railroad Co.*, 32 id. 106.

But whatever may be the true rule on this vexed question, and whether we rightly comprehend the Iowa decisions or not, we have no doubt that the city authorities of Keokuk, representing the public, had the right to widen and improve Water Street to any extent on the river side, by filling in below high water, and building wharves and levees for the public accommodation. By the charter of the city, passed Dec. 13, 1848, it was provided, —

" SECT. 14. That the city council shall have power . . . to establish and constitute landing-places, wharves, docks, and basins in said city, at or on any of the city property, and fix the rates of landing, wharfage, and dockage of all steamboats, boats, rafts, and other water-crafts, and of all goods, wares, merchandise, produce, and other articles that may be moored at, landed on, or taken from any landing, wharf, dock, or basin belonging to said city."

" SECT. 16. That the city council shall have power . . . to license and establish ferries across the Mississippi River from said city to the opposite shore, to fix the rates of the same." . . .

" SECT. 22. The city council shall have exclusive power to establish and regulate the grade of wharves, streets, and banks along the Mississippi River, within the corporate limits of said city."

And by a supplement, passed Jan. 22, 1853, it was provided, —

" SECT. 7. The said city of Keokuk shall have the power to establish and regulate wharf or wharves in said city, and more particularly to use the whole of Water Street for said purpose." . . .

Although it should be conceded that the title of the plaintiff attached to the ground reclaimed and filled in by the city outside of the original high water, it was a bare legal title, subject to the public easement and use, not only for street purposes,

but, for the purposes of wharves, landings, and levees. A street bordering on the river, as this did, according to the plan of the town adopted by the decree of partition, must be regarded as intended to be used for the purposes of access to the river, and the usual accommodations of navigation in such a connection. This subject is discussed in Haight's case, where the court said, —

"One further thought, presented by the petitioner, should be noticed. It is, that if this ground is dedicated to the public, it is as a street only; and that if his rights are subject to the public uses, they are so subject to the use of it only as a street or highway, and not as a wharf, and that it is named and called a street and not a wharf. He claims that the object of a street is for passage, for travelling over, and not to land or deposit goods upon. This is taking a very narrow and close view. The streets of a town are fairly subject to many purposes to which a highway in the country would not be. More regard should be paid to the object and purpose than to the name. The ways of a town would be of comparatively little use if the citizens and traders could not deposit their goods in them temporarily, in their transit to the storehouse; and so of other things, and so it is of the wharf. If goods cannot be deposited upon it in preparation for shipping them, or unladen upon it from boats and vessels, why is a town located near the river upon land which, in other respects, is inconvenient, and is expensive to grade, to bring into form and order, and to keep in repair, instead of upon an even prairie, requiring no such trouble and outlay?"

On the general question as to the rights of the public in a city street, we cannot see any material difference in principle with regard to the extent of those rights, whether the fee is in the public or in the adjacent land-owner, or in some third person. In either case, the street is legally open and free for the public passage, and for such other public uses as are necessary in a city, and do not prevent its use as a thoroughfare, such as the laying of water-pipes, gas-pipes, and the like; and, according to the laws of Iowa (which must be taken to govern the case), it may be occupied by those improved iron ways for public passage which modern skill has devised, and which the advance of general improvement requires. It cannot be

denied that horse-railroads have contributed immensely to the public convenience in furnishing a rapid, cheap, and convenient means of communication between different parts of large towns, and have greatly promoted their increase and growth in wealth and population. By the accommodation which they afford, the citizen can reside miles from his shop or place of business. Though attended with some inconveniences, they have greatly added to the efficiency of the public thoroughfares, and have more than doubled their capacity for travel and transportation.

So other railways coming to cities add greatly to their population and wealth, and furnish greatly increased facilities of communication with other portions of the country.

In Iowa, by the act called the "Right of Way Act," found in the Code of 1851, sect. 735, it is declared that, —

"The county court may also grant licenses for the construction of any canal or railroad, or any macadamized or plank-road, or any other improvement of a similar character, or any telegraph line, to keep the same up for a period not exceeding fifty years, and to use for this purpose any portion of the public highway or other property, public or private, if necessary: *Provided*, such use shall not obstruct the highway." Iowa Revision of 1860, p. 206.

By the construction given to this act by the Supreme Court of the State, railroads, especially when located and constructed under municipal regulation and control, are not regarded as obstructions to a highway in the legal sense, nor as creating, when laid thereon, any injury to the proprietors of the adjacent lands, for which they are entitled to compensation. The cases referred to by the Circuit Court (which are given below) abundantly demonstrate this conclusion, and no elaborate discussion of the subject is required from us. See *Milburn* v. *Cedar Rapids*, 12 Iowa, 249–260; *Clinton* v. *Cedar Rapids & Mo. Railroad Co.*, 24 id. 455; *Tomlin* v. *Dubuque Railroad Co.*, 32 id. 106; *Chicago, Newton, & S. W. Railroad Co.*, 36 id. 299; *Cook* v. *City of Burlington*, id. 357; *Clinton* v. *Clinton & Lyon Railroad Co.*, 37 id. 61; *Ingraham et al.* v. *Chicago, Dubuque, & Minn. Railroad Co.*, 38 id. 669.

The cases cited, it is true, are generally those in which the fee of the streets was in the cities respectively, as is commonly

the case in Iowa. But in Haight's case, in 4 Iowa, the very street now in question was under consideration, and the plaintiff had the same title as that of the plaintiff in the present case; and the principles laid down in all the later cases apply as well where the title of the soil is in the adjacent proprietor as where it is in the city or a third party. And, as before remarked, we can perceive no well-founded difference in principle between the one and the other as to the rights of the public.

The Circuit Court is clearly correct, however, in holding that the construction of a permanent freight depot in Water Street was an unauthorized and improper occupation of that street. It was a total obstruction of the passage; and this, as we have said, cannot be created or allowed. It is subversive of, and totally repugnant to, the dedication of the street, as well as to the rights of the public.

We also concur in the view taken by the Circuit Court as to the reasonableness of the erection of the packet depot in the place where it is located. It is a necessary adjunct to the steamboat landing, and the use of the wharf and levee for the purposes of navigation, and does not occupy any portion of the original street. It is a public use of the river bank, which is absolutely necessary to the use of the river as a navigable water. The erection of levees, wharves, and other accommodations on the very ground appropriated to such purposes by the original plot of the town, or, stronger still, on ground made and reclaimed from the bed of the river adjoining the street thus appropriated, and in enlargement thereof, is clearly within the powers of the city authorities as laid down in the cases referred to. *Judgment affirmed.*

Mr. Justice Miller did not sit in the case, nor take any part in deciding it.